UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of the United States Of America for a Search and Seizure Warrant for a Gray 2019 Dodge Ram Pickup Truck 1500, New York License Plate Number ZNV5311, VIN Number 1C6RR7FG2KS544640, and Any Closed Containers/Items Contained Therein | **Agent Affidavit in Support of Application for Search and Seizure Warrant**<br><br>**19-M-892** |

EASTERN DISTRICT OF NEW YORK) ss.:

MASON WILHITE, being duly sworn, deposes and says:

## I. Introduction

### A. Affiant

1.      I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI").  As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I am a member of the team of law enforcement agents working on the current investigation, which is being conducted by HSI and the New York City Police Department ("NYPD") (collectively, the "Investigating Agency").  As part of my duties as a Special Agent, I have participated in the execution of search warrants of the sort requested here.  I have training and experience executing search warrants, including those authorizing searches for evidence of narcotics trafficking and other crimes.  I have also received training regarding drug trafficking offenses, and am familiar with the ways in which such crimes are commonly conducted.

2.      I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the vehicle specified below (the "**Subject Vehicle**") for, and to seize, the items and information described in Attachment A. This affidavit is

based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**B.   The Subject Vehicle**

3.      The Subject Vehicle is particularly described as a gray 2019 Dodge Ram pickup truck 1500, with New York License Plate Number ZNV5311, and VIN Number 1C6RR7FG2KS544640. As set forth in Attachment A to the proposed warrant, the applied-for warrant would authorize the search and seizure of the Subject Vehicle and any closed containers or items therein, including any cellphones or electronic devices seized from the Subject Vehicle. The Subject Vehicle is depicted below:



4.      Based on my participation in this investigation, as further described below, I know that the Subject Vehicle is currently located in the Eastern District of New York, in a residential parking garage located in the vicinity of 185 South 4th Street, Brooklyn, New York 11211, and therefore that the proposed search and seizure of the Subject Vehicle would be executed only within the Eastern District of New York.

## C.  The Subject Offenses

5.      For the reasons detailed below, I believe that there is probable cause to believe that the Subject Vehicle contains evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Section 841 and 846 (distribution of, and possession with intent to distribute, controlled substances, and conspiracy to do the same) (the "Subject Offenses").

## II.  Probable Cause

### A.  Probable Cause Regarding the Subjects' Commission of the Subject Offenses

6.      On September 25, 2019, a grand jury in the Southern District of New York returned a sealed indictment (the "Indictment") charging six defendants for their participation in a cocaine and heroin trafficking conspiracy from at least in or about January 2017 through at least in or about September 2019—when the Indictment was returned.  A copy of the Indictment is attached hereto as Exhibit A and is incorporated by reference as if set forth fully herein.

7.      As set forth in greater detail in the Indictment, this investigation involves a drug trafficking organization ("DTO") engaged in a drug delivery service, which identifies itself as "Mike's Candyshop."  *See* Indictment, Ex. A, ¶¶ 1-3.  The DTO delivers cocaine and heroin on demand to customers in New York City, and has distributed numerous kilograms of cocaine and heroin throughout the course of the conspiracy.  *Id.*  The DTO's customers place delivery orders via text message to a centralized phone number (the "Candyshop Number").  The operator of the Candyshop Number is usually ARIEL TAVAREZ, a/k/a "A," a/k/a "Mike," one of the charged

3

defendants, the leader of the DTO.  Using the Candyshop Number, TAVAREZ accepts the orders and subsequently arranges for a courier working for the DTO to deliver the narcotics to the customer, usually within hours of the customer texting his or her order to the Candyshop Number. *Id.* The Indictment details some of the means and methods of the Mike's Candyshop DTO, which has been supplying cocaine and heroin to its customers in New York City for years.

8.     The defendants charged as members of the DTO in the Indictment are: ARIEL TAVAREZ, a/k/a "A," a/k/a "Mike" ("TAVAREZ"), CHRISTIAN BAEZ ("BAEZ"), LUIS MESON, a/k/a "Sito" ("MESON"), GREGORIS MARTINEZ, a/k/a "Greg" ("MARTINEZ"), KEVIN GRULLON, a/k/a "Kev," a/k/a "JB" ("GRULLON"), and JOIFFREY URENA, a/k/a "Jeff," a/k/a "Jay" ("URENA").  *Id.* at ¶¶ 14-16.

9.     Based on my participation in this investigation, including my participation in surveillance, my review of reports of conversations with civilian witnesses, and my conversations with law enforcement agents participating in this investigation, I believe that the DTO has continuously operated selling heroin and cocaine in New York City using the Candyshop Number from at least January 2017 through the present, that TAVAREZ is the leader of the DTO, and that the means and methods of the DTO's operation have remained generally consistent over that time period.  *Id.* at ¶¶ 1-13.

Background: The DTO

10.     Based on my participation in this investigation, conversations with law enforcement officers participating in this investigation, my review of text messages obtained pursuant to judicially-authorized orders of interception, as well as my training, experience, and research, I have learned the following, in substance and among other things, as set forth in greater detail in the Indictment:

      a.    The Mike's Candyshop DTO has operated for an extended period, supplying cocaine and heroin to customers in New York City for years. The DTO consists of a group of individuals who are engaged in a drug delivery service distributing heroin and cocaine to customers on demand in and around Manhattan and Brooklyn, New York, from approximately 6:00 p.m. to 12:00 a.m. seven days a week, with the exception of certain major holidays.

      b.    To become a customer of the Mike's Candyshop DTO, an individual generally has to be referred by an existing customer. Once an individual becomes an approved customer of the DTO, the individual can order narcotics from the Candyshop Number using coded language. For example, customers can order for delivery a "shirt," which is the DTO's code for a vial of cocaine, or a "book," which is the DTO's code for ten glassines of heroin. As a means of marketing its cocaine, and to ensure that the DTO's customers know the cocaine provided by the couriers belongs to the DTO, the DTO sells its cocaine in vials sealed with different colored tops.

      c.    The members of the DTO play a variety of roles. TAVAREZ is the leader of the DTO and controls and directs its operations, including by acting as the primary operator of the Candyshop Number. Certain of the DTO members, including BAEZ, MESON, and MARTINEZ, manage the DTO's day-to-day supply of drugs and cash proceeds. Certain of the DTO members, including BAEZ, MESON, GRULLON, and URENA, act as "couriers" for the DTO, and regularly deliver and sell narcotics to the DTO's customers in hand-to-hand drug transactions coordinated through the Candyshop Number.

      d.    The DTO maintains stash locations, including in Brooklyn, New York, where the DTO stores heroin and cocaine as well as cash proceeds from the DTO's drug sales. TAVAREZ, primarily using the Candyshop Number, instructs members of the DTO on where and how to access the stash locations to obtain drugs for distribution and where to leave the cash

proceeds from the sales.  TAVAREZ regularly travels from his home in Pennsylvania to New York City to resupply the DTO's stash locations with heroin and cocaine and to retrieve the DTO's cash proceeds.  In addition, as set forth in greater detail below, TAVAREZ and members of the DTO have relied on HARRY GOMEZ, a Target Subject of the investigation, to transport narcotics proceeds.

     e.  The DTO employs various means and methods designed to evade law enforcement detection, including selling only to customers that have been referred by existing customers, delivering narcotics directly to customers at locations specified by the customer, periodically changing the Candyshop Number, and using coded language to discuss narcotics.

   11.  Based on my training and experience in prior narcotics investigations, I know that drug trafficking operations like the DTO, which sell large quantities of drugs on a daily basis, take steps to conceal the locations of their drug supply and drug proceeds, including by maintaining multiple drug stashes or drug premises where drugs are packaged and stored and where drug proceeds are stored for safe-keeping.

   12.  Based on my involvement in this investigation, including my review of judicially-authorized interceptions of electronic communications over the Candyshop Number, I am aware that DTO members, including TAVAREZ and the DTO's couriers, frequently used the code words "garage" and "stockroom" in text messages to refer to a location—a parking garage (the "Garage"), as explained below—where the DTO stashes narcotics and narcotics proceeds.  For example, on or about July 26, 2019, at approximately 7:00 p.m., TAVAREZ, using the Candyshop Number, exchanged messages in a group chat with two of the DTO's couriers, MESON and BAEZ.  The following exchange occurred, in substance and in part:

   Baez:    Walking to stock room

[…]

| | |
|---|---|
| Meson: | Theres books here? |
| Meson: | Rice shit looks empty |
| Tavarez: | Need eta |
| Tavarez: | Yes |
| Baez: | Diff bag |
| Meson: | One with a box? |
| Tavarez: | In the rice |
| Tavarez: | ETA pls |
| Meson: | 26 mins mil |
| Baez: | There's no more books ??? |
| Tavarez: | They gotta be I drop 100 Tuesday |

13.     Based on my training, experience, and involvement in this investigation, including my review of other intercepted communications, I believe that, in this exchange, TAVAREZ, MESON, and BAEZ are using coded language to describe the quantities of heroin ("books") that they have available for sale to customers of Mike's Candyshop and the location where DTO members store heroin and cocaine, referred to as the "stock room."  In this exchange, BAEZ informs TAVAREZ and MESON that he is walking to the "stock room," and then asks about the quantity of heroin available in the stock room ("There's no more books ???").  TAVAREZ states that he recently brought a supply of heroin to the stock room ("They gotta be I drop 100 Tuesday").

14.     Based on my involvement in this investigation, including my review of judicially-authorized interceptions of electronic communications over the Candyshop Number, my

7

participation in surveillance, and my conversations with other law enforcement officers, I am aware of the following, in substance and among other things:

        a.     On or about August 1, 2019, starting at approximately 10:23 p.m., TAVAREZ and BAEZ engaged in the following text exchange, in substance and in part:

| Baez: | I'ma get books quick |
| Tavarez: | Okay |
| Baez: | Stock room 18 min |
| […] | |
| Baez: | Walking to garage now |
| […] | |
| Baez: | No more books |
| Baez: | They all gone |
| […] | |
| Tavarez: | Okay |

        b.     Based on my training, experience, and my involvement in this investigation, including my review of other intercepted communications, I believe that, in this exchange, TAVAREZ and BAEZ are using coded language to describe one of the DTO's stash locations— the Garage.  Specifically, BAEZ told TAVAREZ that he (BAEZ) was going to obtain heroin ("I'ma get books quick") from the stash location ("Stock room 18 min"; "Walking to garage now"). BAEZ's text also indicates that the stash location is located at a garage.

        c.     On or about August 1, 2019, at approximately 10:40 p.m., several minutes before BAEZ texted the message "Walking to garage now" to TAVAREZ, law enforcement officers conducting surveillance at 185 South Fourth Street in Brooklyn, New York (the "Stash

8

Building"), *i.e.*, the building in which the Garage is located, observed a black Toyota Camry ("Vehicle-1") arrive in the vicinity of the Stash Building. Based on their involvement in this investigation, including their participation in prior surveillance and their review of photographs of BAEZ in law enforcement records, the surveilling law enforcement officers recognized the driver of Vehicle-1 to be BAEZ. Law enforcement then observed BAEZ enter the Stash Building and walk through an entryway that leads to the Garage. Approximately three minutes later, law enforcement observed BAEZ exit the Stash Building. Approximately four minutes later, BAEZ sent a text message to TAVAREZ stating, "No more books. They all gone." Based on the foregoing and my training and experience, I believe that BAEZ went to the Garage to renew his supply of heroin but, when he arrived, BAEZ learned that there was no more heroin located in the Garage and informed TAVAREZ accordingly ("they all gone").

15. Based on my involvement in this investigation, including my review of judicially-authorized interceptions of electronic communications over the Candyshop Number, my participation in surveillance, and my conversations with other law enforcement officers, I am aware of the following, in substance and among other things:

a. On or about August 20, 2019, at approximately 9:38 p.m., BAEZ texted TAVAREZ, "I need Bs . . . 20 mins to stock." Based on my training, experience, and involvement in this investigation, including my review of other intercepted electronic communications, I believe that, in this exchange, BAEZ is using coded language to say that he is going to the Garage ("20 mins to stock") because he needs to renew his supply of heroin ("I need Bs," which is shorthand for "books," which, in turn, is the DTO's code word for heroin).

b. At approximately 10:01 p.m. that same evening, BAEZ texted TAVAREZ, "Walking to stock." Approximately twenty minutes after BAEZ's text, "20 mins to stock," agents

conducting physical surveillance observed BAEZ enter the Stash Building and walk through an entryway that leads to the Garage.

16.     Based on my involvement in this investigation, including my review of judicially-authorized interceptions of electronic communications over the Candyshop Number, I am aware that on or about August 21, 2019, starting at approximately 11:46 p.m., TAVAREZ and GRULLON engaged in the following text message exchange, in substance and in part:

| | |
|---|---|
| Tavarez: | Drop off |
| Tavarez: | Send math |
| Tavarez: | Let me Kno when u drop off |
| […] | |
| Grullon: | Bet I'm doing math now |
| Tavarez: | Ok |
| Grullon: | Leo 70<br>City 200<br>Michael 370<br>Paul 90<br>Danny 270<br>Total 1000 10s 5b |
| Grullon: | Walking to drop off now |

17.     Based on my training, experience, and involvement in this investigation, including my review of other intercepted communications, as well as the surveillance described below, I believe that, in this text exchange, TAVAREZ is asking GRULLON to send a list of his total drug sales for that evening ("Send math") and to drop off the narcotics proceeds inside of a location in the Garage ("Drop off"; "Let me kno when u drop off"), and GRULLON is telling TAVAREZ that the sales for the evening totaled $1,000 ("Total 1000") from selling ten vials of cocaine ("10s,"

which, I believe, is a reference to 10 shirts, the DTO's code for vials of cocaine) and five ten-packs of heroin glassines ("5b," which, I believe, is a reference to 10 books).

18.     Based on my involvement in this investigation, I am aware that at or around the same time that GRULLON texted TAVAREZ the message, "Walking to drop off now," law enforcement officers familiar with the appearance of GRULLON, based on photographs of GRULLON maintained in a law enforcement database, observed GRULLON enter the Stash Building and walk through an entryway that leads to the Garage.  Based on the foregoing and my training and experience, I believe that GRULLON entered the Stash Building to drop off narcotics proceeds inside a location in the Garage, which was done at the direction of TAVAREZ.

19.     Based on my involvement in this investigation, including my review of judicially-authorized interceptions of electronic communications over the Candyshop Number, my participation in surveillance, and my conversations with other law enforcement officers, I am aware that TAVAREZ re-supplied the Garage with narcotics on or about August 24, 2019. Specifically, I am aware of the following, in substance and among other things:

a.     On or about August 24, 2019, at approximately 6:00 p.m., TAVAREZ used the Candyshop Number to text MESON and URENA the following message, "Got work in garage eta." Based on my training, experience, and involvement in this investigation, including my review of other intercepted electronic communications, I believe that TAVAREZ is telling his co-conspirators that he dropped off narcotics ("work") at the Garage ("garage") and is asking MESON and URENA for the estimated arrival time at the Stash Building.  MESON responded, in substance and in part, "gimme like 15-20 mins."

b.     Based on my review of surveillance video from inside the Garage on or about August 24, 2019, at approximately 8:12 p.m., I observed TAVAREZ park his vehicle in a

specific parking spot in the Garage ("Parking Spot-1").  TAVAREZ was then observed in the

Garage holding an object in his left hand that appeared to be a bag.  TAVAREZ walks towards

the corner of the Garage where a storage room (the "Storage Room") is located, which is just

beyond the area captured by the surveillance video.  Approximately forty seconds later,

TAVAREZ reappears on the surveillance video, walking from the direction of the Storage

Room, without the bag.  Based on the foregoing and my training and experience, I believe that

TAVAREZ entered the Garage to again replenish the supply of narcotics inside the Garage.

    20.      Based on my participation in this investigation, including my review of judicially-

authorized interceptions of electronic communications over the Candyshop Number, my

participation in surveillance, and my conversations with other law enforcement officers who

conducted surveillance, I have learned that TAVAREZ and the DTO uses HARRY GOMEZ, a

Target Subject of the investigation, to transport narcotics proceeds:

        a.      Based on my review of toll records for a cellphone believed to be used by

TAVAREZ (the "Tavarez Phone"),[1] I am aware that TAVAREZ has had significant contacts with

a cellphone believed to be used by HARRY GOMEZ (the "Gomez Phone"),[2] which is subscribed

---

[1] The Tavarez Phone is subscribed to in the name "Ariel Tavarez."  Based on my review of GPS location data from the Tavarez Phone and the Candyshop Number, obtained pursuant to judicially-authorized warrants, and my conversations with other law enforcement agents, I am aware that the Tavarez Phone and the Candyshop Number frequently travel together.  For example, on or about April 7, 2019 at approximately 6:41 p.m., location data from the Candyshop Number and the Tavarez Phone indicated that both cellphones were located near 122 Jackson Court, East Stroudsburg, Pennsylvania, that is, the address where TAVAREZ is known to reside.  At approximately 8:11 p.m. that day, cellphone location data indicated that both phones were in the vicinity of Harrison, New Jersey, traveling eastbound toward New York City, and at approximately 9:12 p.m., cellphone location data indicated that both phones were in the vicinity of South 8th Street and Roebling Street in Brooklyn, New York.

[2] Based on my review of records obtained from AT&T, I am aware that the Gomez Phone is subscribed to in the name "HARRY THE BROKER" and that the billing address is 136 Cornelia Street in Brooklyn.  Based on my review of records obtained from AT&T, I am aware of other

to in the name "HARRY THE BROKER." For example, between approximately October 2, 2017 and September 8, 2019, the Tavarez Phone had approximately 628 contacts with the Gomez Phone.

   b. On or about July 26, 2019, at approximately 6:50 p.m., the Candyshop Number, believed to be used by TAVAREZ, sent a group text message to BAEZ and MESON. The message appears to show a picture of a spreadsheet on a computer, which I believe, based on my training, experience, and participation in this investigation, including the text messages discussed below, reflect information about proceeds from the Mike's Candyshop DTO's drug sales from several couriers:



After sending this picture, TAVAREZ, using the Candyshop Number, and BAEZ and MESON engaged in the following text message exchange:

| Tavarez: | U gave Harry 1874 the rest disappeared? |
| Tavarez: | For luis |
| Meson: | which one missing 975 ? |

---

cellphones serviced by AT&T with the same billing address and which are subscribed to in the name "Harry Gomez."

| Tavarez: | U know |
| Tavarez: | I need it today |
| Tavarez: | Make that happen |
| Tavarez: | With today's money pls |
| Meson: | Ok |
| Meson: | Is it that one my phones notes all deleted |
| Tavarez: | Thanks |
| Tavarez: | I told u right before that what had to be giving come on man |
| Tavarez: | Next time interest for the forced loan u be taking |

c.      Based on my involvement in this investigation, including my review of this and similar intercepted communications, TAVAREZ appeared to be accounting for money that TAVAREZ was missing from MESON based on the drug sales that MESON had completed for the Mike's Candyshop DTO ("U gave Harry 1874 the rest disappeared?  For Luis").  MESON responded by asking which day of MESON's proceeds from his drug distribution on behalf of the DTO was missing ("which one missing 975 ?"), which appears to be a reference to one of the spreadsheet boxes in the picture TAVAREZ had sent, shown above.  Based on my training and experience, and involvement in this investigation, I believe that MESON asked which day's proceeds TAVAREZ was missing because, as discussed above, each courier was responsible for sending TAVAREZ daily updates regarding the total proceeds that the courier owed TAVAREZ.  TAVAREZ replied and insisted he needed MESON to deliver the money to TAVAREZ that day along with the narcotics proceeds MESON obtained by the close of business on July 26, 2019 ("With today's money pls").  While MESON attempted to explain why TAVAREZ was missing money from MESON's narcotics sales ("Is it that one my phones notes all deleted"), TAVAREZ

dismissed MESON's explanation as an excuse and indicated that the next time TAVAREZ would charge MESON interest for any missing proceeds ("Next time interest for the forced loan u be taking").

        d.     On or about August 14, 2019, at approximately 9:27 p.m., the Candyshop Number, believed to be used by TAVAREZ, sent a group text message to BAEZ and GRULLON, stating, "Bet go home and then meet Harry for me with 4000." Based on my involvement in this investigation, including my review of other intercepted messages, and my training and experience, I believe that TAVAREZ was directing BAEZ to meet HARRY GOMEZ and provide him with $4,000 in narcotics proceeds. Later that same evening, at approximately 10:23 p.m., BAEZ sent a group text message to TAVAREZ and GRULLON, stating, "15 mins from Harry." Based on foregoing, my involvement in this investigation, and my training and experience, I believe that BAEZ delivered approximately $4,000 in narcotics proceeds to HARRY GOMEZ on or about August 14, 2019.

**B. Probable Cause Regarding the Subject Vehicle**

        21.     In the early morning of October 2, 2019, law enforcement agents arrested TAVAREZ, BAEZ, MESON, MARTINEZ, and URENA, pursuant to arrest warrants signed by the Honorable Robert W. Lehrburger, United States Magistrate Judge for the Southern District of New York. Shortly after the arrests, agents executed a judicially-authorized search warrant of the Storage Room located in the Garage. While officers did not recover evidence of the Subject Offenses from inside the Storage Room, agents obtained consent to search a large cardboard box that was in the Garage (the same residential parking garage in which the Subject Vehicle is located) and directly outside of the Storage Room. From inside the box, agents seized, among other things, United States bulk currency (approximately $5,200) and bags of rice, which are known to be used by the DTO to store heroin.

22.    Based on my participation in this investigation, including my conversations with other law enforcement agents, I am aware of the following, among other things, regarding the Subject Vehicle, which is currently located in the Garage and believed to be used by HARRY GOMEZ to transport narcotics proceeds on behalf of the DTO:

a.    While executing the search warrant in the Garage, agents observed an unknown male ("UM-1") approach the Subject Vehicle, which was parked in Parking Spot-1, *i.e.*, the same parking spot in which agents had previously observed TAVAREZ park his vehicle. Between approximately August 2019 and September 2019, surveilling law enforcement agents involved in this investigation observed the Subject Vehicle in Parking Spot-1 on at least three occasions. Based on my involvement in this investigation, I am aware that the superintendent of the Stash Building told law enforcement, in substance and in part, that only residents of the Stash Building are permitted to park vehicles in the Garage.

b.    UM-1 appeared to be nervous when he observed law enforcement in the Garage. When agents asked UM-1 if he owned the Subject Vehicle, he stated, in substance and in part, that it was not his vehicle, that the Subject Vehicle belonged to a company, and that he was picking up the Subject Vehicle so that he could transport an elderly woman to a medical appointment. UM-1 further stated, in substance and in part, that "Harry" lets UM-1 use the Subject Vehicle. Law enforcement agents asked UM-1 for consent to search the Subject Vehicle, but UM-1 declined.[3]

---

[3] Law enforcement walked a canine trained in the detection of narcotics around the perimeter of the Subject Vehicle. The canine did not indicate the presence of narcotics. The canine is not trained in the detection of United States currency. The proposed warrant attached to this affidavit does not seek authorization to search the Subject Vehicle for narcotics. Rather, the warrant seeks authorization to search the Subject Vehicle for records and proceeds of narcotics offenses, including currency.

c. The Subject Vehicle is registered to "Harry Raymond Gomez," believed to be the same individual that TAVAREZ and the DTO use to transport narcotics proceeds. Based on my review of law enforcement databases, I am aware that the Subject Vehicle's registration lists a certain address located in Pennsylvania (the "Gomez Address"). Based on my involvement in this investigation, I am aware that MARTINEZ (*i.e.*, one of the DTO's narcotics couriers), was previously observed driving a vehicle ("Vehicle-2"), on or about August 15, 2019, in connection with a narcotics transaction. Specifically, MARTINEZ drove Vehicle-2 to meet an undercover law enforcement officer ("UC-1") to sell UC-1 cocaine. Based on law enforcement records, I am aware that Vehicle-2 is registered to the Gomez Address.

d. While lawfully standing next to the Subject Vehicle and looking through the Subject Vehicle's windows, agents observed a hat inside the Subject Vehicle that appears to be consistent with a hat that agents previously observed TAVAREZ wearing.

e. Based on their review of records provided by the company that manages the apartment building in which the Garage is located, law enforcement learned that there is no record of a "Harry Gomez" residing in that building.

23. Based on my training, experience, and participation in this and other investigations, I have learned the following, in substance and in part:

a. Narcotics traffickers often maintain on hand, and therefore transport in their vehicles, large amounts of U.S. currency in order to maintain and finance their narcotics trafficking.

b. Individuals who engage in narcotics trafficking often maintain or transport books, records, receipts, notes, ledgers, airline tickets, money orders, passports, and other papers relating to the procurement, distribution, storage, and transportation of controlled substances in

vehicles. These records can include the telephone numbers of customers and sources and the amount of controlled substances distributed to various customers, along with running totals of debts owed by those customers. Such individuals also maintain paraphernalia utilized to cut and package controlled substances in locations to which narcotic traffickers have frequent and ready access, *i.e.,* vehicles. Based on my training and experience I know that it is common for drug traffickers to maintain these records for significant periods of time, to include several years, for the purpose of knowing what debts are owed to them or what debts they may owe.

c.     It is common for narcotics traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their vehicles for ready access and to conceal them from law enforcement authorities. Such contraband and proceeds often includes caches of narcotics, significant amounts of currency, financial instruments, precious metals, jewelry, automobile titles, and other items of value and/or proceeds of drug sales, and evidence of financial transactions, including evidence of spending large sums of cash acquired from engaging in drug trafficking activities.

d.     Individuals who engage in narcotics trafficking often maintain or transport contact information of their criminal associates or co-conspirators in their vehicles.

e.     Individuals who engage in narcotics trafficking often maintain or transport in their vehicles logs, ledgers, receipts, telephone numbers, ATM receipts, travel records, telephone numbers, caches of narcotics, substances commonly utilized to mix or dilute narcotics, money derived from drug sales, telephones utilized to facilitate drug trafficking, and other documents related to their drug trafficking activities, in order to have those items in locations in which the drug trafficker has immediate access.

f.      During or in relation to drug transactions, individuals who engage in narcotics trafficking often take or cause to be taken photographs of themselves, their associates, their property, and their product, and often maintain such photographs in properties that they control, including their vehicles.

24.      Based on the foregoing, I respectfully submit that there is probable cause to believe that the Subject Vehicle contains fruits, instrumentalities, and evidence of the Subject Offenses.

## C.  Probable Cause Justifying Search of ESI

25.      Through my training and experience, I know that the commission of the Subject Offenses in the manner set forth above necessarily requires the use of computers, smart phones, tablets, and other computer devices and storage media for the conspiracy to connect with suppliers and customers, and communicate with co-conspirators. I have learned through training and experience that individuals who engage in the Subject Offenses in this way also commonly use such electronic devices to keep track of suppliers, customers, and co-conspirators, keep records of illegal transactions and criminal proceeds, and store copies of online chats, emails, and other data. As a result, they often store data on their electronic devices related to their illegal activity, which can include logs of online "chats" with co-conspirators, email correspondence, contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social media accounts, financial and personal identifying data for co-conspirators and customers, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals, and/or records of illegal transactions or the disposition of criminal proceeds. In such cases, I know that perpetrators often keep such electronic devices inside their homes. In the case of smart phones, tablets, and laptop computers, perpetrators may also keep such devices on their person, either in their pockets or in containers such as carrying bags, cases, backpacks or protective sleeves.

26.     Based on the foregoing, there is probable cause to believe that TAVAREZ is the leader of the DTO and controls and directs its operations, including by acting as the primary operator of the Candyshop Number, and that he uses electronic devices to commit the Subject Offenses, including to coordinate narcotics transactions over the Candyshop Number from the Subject Premises.  Specifically, as discussed above, based on my review of communications that were intercepted as part of this investigation and pursuant to judicially authorized court orders, I know that members of the DTO — including ARIEL TAVAREZ, a/k/a "A," a/k/a "Mike," CHRISTIAN BAEZ, LUIS MESON, a/k/a "Sito," GREGORIS MARTINEZ, a/k/a "Greg," KEVIN GRULLON, a/k/a "Kev," a/k/a "JB," and JOIFFREY URENA, a/k/a "Jeff," a/k/a "Jay" — use cellular telephones to communicate about the DTO, and that HARRY GOMEZ is in regular contact with TAVAREZ, who is believed to transport narcotics proceeds on behalf of the DTO.

27.     Based on my training and experience, I also know that, where electronic devices are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or even years after it occurred.  This is typically true because:

- Electronic files can be stored on a hard drive for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

- Even when a user does choose to delete data, the data can often be recovered months or years later with the appropriate forensic tools. When a file is "deleted" on a computer, the data contained in the file does not actually disappear, but instead remains on the hard drive, in "slack space," until it is overwritten by new data that cannot be stored elsewhere on the computer. Similarly, files that have been viewed on the Internet are generally downloaded into a temporary Internet directory or "cache," which is only overwritten as the "cache" fills up and is replaced with more recently viewed Internet pages. Thus, the ability to retrieve from a hard drive or other electronic storage media depends less on when the file was created or viewed than on a particular user's operating system, storage capacity, and computer habits.

- In the event that a user changes computers, the user will typically transfer files from the old computer to the new computer, so as not to lose data.  In addition, users often keep backups of their data on electronic storage media such as thumb drives, flash memory cards, CD-ROMs, or portable hard drives.

28.     Based on the foregoing, I respectfully submit there is probable cause to believe that the defendants named in the Indictment and HARRY GONEZ are engaged in a conspiracy to distribute and possess with intent to distribute controlled substances, and that evidence of this criminal activity is likely to be found in the Subject Vehicle and on cellular telephones, computers, and electronic storage media found in the Subject Vehicle.  In particular, there is probable cause to believe that the Subject Vehicle will contain evidence, fruits, and instrumentalities of violations of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant, including the following:

a.    concerning occupancy or ownership of the Subject Premises, including without limitation, utility and telephone bills, mail envelopes, addressed correspondence, bank statements, identification documents, address books, telephone directories, and keys.

b.  Evidence concerning the procurement, receipt, storage, or shipping of controlled substances, including without limitation, opened or unopened packages, packing material, shrink wrap, vials, glassines, and communications with co-conspirators and others about any of the aforementioned subjects.

c.  Evidence concerning the distribution of controlled substances, including without limitation, books, records, receipts, notes, ledgers, accounts, delivery and payment records, and other papers relating to the transportation, ordering, purchase and distribution of controlled substances, and communications with customers, co-conspirators, and others about any of the aforementioned subjects.

d.  Evidence concerning the identity or location of, and communications with co-conspirators, including contact information.

e.  Evidence and proceeds of drug trafficking, including United States currency and electronic payments, deposits, or funds transfers, including without limitation, any paper or digital account opening documents, statements, deposit slips, checkbooks, orders or confirmations of wire transfers, records of any accounts or transactions within the traditional banking or credit systems, and communications with financial services representatives, co-conspirators, or other third parties about any of the aforementioned subjects.

f.  Evidence as described in Sections A.II. of this Attachment contained in any and all locked and closed containers in the Subject Premises.

g.  Passwords and keys necessary to obtain access to locked closed containers.

## III. Conclusion and Ancillary Provisions

25.     Based on the foregoing, I respectfully request the court to issue a warrant to seize

the items and information specified in Attachment A to this affidavit and to the Search and Seizure

Warrant.

MASON WILHITE
Special Agent
Homeland Security Investigations

Sworn to before me on
October 2, 2019

/s/ SMG

THE HONORABLE STEVEN M. GOLD
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

22

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA      :

        - v. -           :

ARIEL TAVAREZ,           :
    a/k/a "A,"
    a/k/a "Mike,"      :
CHRISTIAN BAEZ,
LUIS MESON,           :
    a/k/a "Sito,"
GREGORIS MARTINEZ,     :
    a/k/a "Greg,"
KEVIN GRULLON,        :
    a/k/a "Kev,"
    a/k/a "JB," and    :
JOIFFREY URENA,
    a/k/a "Jeff,"     :
    a/k/a "Jay,"

          Defendants.      :

- - - - - - - - - - - - - - - - - X

**SEALED**
**INDICTMENT**

19 Cr.

## COUNT ONE
### (Narcotics Trafficking Conspiracy)

The Grand Jury charges:

### OVERVIEW OF THE CONSPIRACY

1.    At all times relevant to this Indictment, a drug trafficking organization (the "DTO") known as "Mike's Candyshop" was operating in and around New York City. The DTO consists of a group of individuals who are engaged in a drug delivery service distributing heroin and cocaine to customers in and around Manhattan and Brooklyn, New York. The leader of the DTO is ARIEL TAVAREZ, a/k/a "A," a/k/a "Mike," the defendant. From at least in or about January 2017, up to and including in or about September

2019, TAVAREZ and his associates CHRISTIAN BAEZ, LUIS MESON, a/k/a "Sito," GREGORIS MARTINEZ, a/k/a "Greg," KEVIN GRULLON, a/k/a "Kev," a/k/a "JB," and JOIFFREY URENA, a/k/a "Jeff," a/k/a "Jay," the defendants (collectively, the "Defendants"), all of whom were members of the DTO, and others known and unknown, conspired to distribute heroin and cocaine. During that period, the DTO distributed numerous kilograms of heroin and cocaine to its customers in New York City.

2.      The DTO operates a drug delivery service, which identifies itself as "Mike's Candyshop." The DTO delivers cocaine and heroin on demand to customers in New York City. The DTO's customers can place delivery orders via text message to a centralized phone number (the "Candyshop Number"). The operator of the Candyshop Number, who is usually ARIEL TAVAREZ, a/k/a "A," a/k/a "Mike," the defendant, accepts the orders and subsequently arranges for a courier working for the DTO to deliver the narcotics to the customer, usually within hours of the customer texting his or her order to the Candyshop Number.

3.      The couriers and customers typically communicate and coordinate drug transactions through the operator of the Candyshop Number, who is usually ARIEL TAVAREZ, a/k/a "A," a/k/a "Mike," the defendant. For example, the couriers typically provide updates about their locations via text message to the Candyshop Number, and the operator then relays those updates to the customers placing the orders. When the courier delivering the narcotics

2

arrives in the customer's vicinity, the customer generally receives instructions – from the operator of the Candyshop Number – about how to identify the courier and/or where to meet the courier to receive the cocaine and/or heroin.

4.    To become a customer of the Mike's Candyshop DTO, an individual generally has to be referred by an existing customer. Once an individual becomes an approved customer of the DTO, the individual can order narcotics from the Candyshop Number using coded language. For example, customers can order for delivery a "shirt," which is the DTO's code for a vial of cocaine, or a "book," which is the DTO's code for ten glassines of heroin.  As a means of marketing its cocaine, and to ensure that the DTO's customers know the cocaine provided by the couriers belongs to the DTO, the DTO sells its cocaine in vials sealed with different colored tops.

5.    On or about December 16, 2018, a customer of the DTO ("Victim-1") died of a drug overdose in New York, New York. At the scene of the overdose, law enforcement officers found Victim-1's cellphone, empty vials with colored tops, and a glassine next to a powder mixture containing, among other substances, heroin and cocaine. Victim-1's cellphone contained text messages showing that Victim-1 had ordered narcotics from the Candyshop Number on numerous occasions, including the day before Victim-1's death. Approximately one day before Victim-1's fatal overdose, after Victim-1 ordered a "shirt" - that is, a vial of cocaine – and a

3

"book" - that is, ten glassines of heroin - from the Candyshop Number, Victim-1 received narcotics from a courier for the DTO at Victim-1's Manhattan residence. Within weeks of Victim-1's death, the DTO changed the Candyshop Number twice in part to avoid law enforcement detection. The DTO nevertheless continued to operate its on-demand cocaine and heroin delivery service, supplying customers in New York City with cocaine and heroin on a daily basis.

## MEANS AND METHODS OF THE CONSPIRACY

6. Members of the DTO fulfilled different roles within the DTO. ARIEL TAVAREZ, a/k/a "A," a/k/a "Mike," the defendant, was the leader of the DTO and controlled and directed its operations, including by acting as the primary operator of the Candyshop Number. Certain of the Defendants, including CHRISTIAN BAEZ, LUIS MESON, a/k/a "Sito," and GREGORIS MARTINEZ, a/k/a "Greg," managed the DTO's day-to-day supply of drugs and cash proceeds. The DTO maintained stash locations, including in Brooklyn, New York, where the DTO stored heroin and cocaine as well as cash proceeds from the DTO's drug sales. TAVAREZ instructed members of the DTO on where and how to access the stash locations to obtain drugs for distribution and where to leave the cash proceeds from the sales. TAVAREZ regularly travelled from his home in Pennsylvania to New York City to resupply the DTO's stash locations with heroin and cocaine and to retrieve the DTO's cash proceeds. Certain of the Defendants, including CHRISTIAN

4

BAEZ, LUIS MESON, a/k/a "Sito," KEVIN GRULLON, a/k/a "Kev," a/k/a "JB," and JOIFFREY URENA, a/k/a "Jeff," a/k/a "Jay," acted as "couriers" for the DTO, and regularly delivered and sold narcotics to the DTO's customers in hand-to-hand drug transactions coordinated through the Candyshop Number.

7.    For example, on or about December 14, 2018, Victim-1 exchanged text messages with the Candyshop Number arranging to purchase cocaine and heroin from the DTO. Following text messages with the Candyshop Number to coordinate the transaction, in the early morning hours of December 15, 2018, CHRISTIAN BAEZ, the defendant, arrived at Victim-1's residence in Manhattan and sold narcotics to Victim-1.

8.    On or about January 10, 2019, a law enforcement officer working in an undercover capacity ("UC-1") exchanged text messages with the Candyshop Number arranging to purchase narcotics from the DTO. Later that day, as coordinated through such text messages with the Candyshop Number, LUIS MESON, a/k/a "Sito," the defendant, sold a quantity of heroin and cocaine to UC-1 in Manhattan.

9.    On or about July 23, 2019, ARIEL TAVAREZ, a/k/a "A," a/k/a "Mike," the defendant, operating the Candyshop Number, coordinated the delivery of a quantity of cocaine to a DTO customer ("Customer-1") in Manhattan. Following Customer-1's request via text message to the Candyshop Number to purchase a quantity of cocaine, TAVAREZ, using the Candyshop Number, instructed KEVIN

5

GRULLON, a/k/a "Kev," a/k/a "JB," the defendant, to deliver a quantity of cocaine to Customer-1. Later that day, GRULLON sold a quantity of cocaine to Customer-1.

10. On or about July 24, 2019, ARIEL TAVAREZ, a/k/a "A," a/k/a "Mike," the defendant, operating the Candyshop Number, arranged for KEVIN GRULLON, a/k/a "Kev," a/k/a "JB," the defendant, to retrieve cocaine from GREGORIS MARTINEZ, a/k/a "Greg," the defendant, for subsequent distribution. On or about July 29, 2019, TAVAREZ, operating the Candyshop Number, arranged for CHRISTIAN BAEZ, the defendant, to retrieve cocaine from MARTINEZ for subsequent distribution.

11. On or about August 2, 2019, ARIEL TAVAREZ, a/k/a "A," a/k/a "Mike," the defendant, operating the Candyshop Number, coordinated the delivery of a quantity of cocaine to a DTO customer ("Customer-2") in Brooklyn. Following Customer-2's request via text message to the Candyshop Number to purchase a quantity of cocaine, TAVAREZ, using the Candyshop Number, instructed JOIFFREY URENA, a/k/a "Jeff," a/k/a "Jay," to deliver a quantity of cocaine to Customer-2. Later that day, URENA sold a quantity of cocaine to Customer-2.

12. The members of the DTO generally worked in shifts, seven days per week, from approximately 6:00 p.m. to 12:00 a.m., distributing the DTO's heroin and cocaine to customers in New York City. The DTO generally did not operate during certain holidays such as Thanksgiving, New Year's Eve, and Labor Day, but otherwise

6

distributed narcotics to customers on a daily basis.

13.   The DTO employed various means and methods designed to evade law enforcement detection, including selling only to customers that had been referred by existing customers, delivering narcotics directly to customers at locations specified by the customer, periodically changing the Candyshop Number, and using coded language to discuss narcotics.  The Mike's Candyshop DTO has operated for an extended period, supplying cocaine and heroin to customers in New York City for years.

### STATUTORY ALLEGATIONS

14.   From at least in or about January 2017, up to and including at least in or about September 2019, in the Southern District of New York and elsewhere, ARIEL TAVAREZ, a/k/a "A," a/k/a "Mike," CHRISTIAN BAEZ, LUIS MESON, a/k/a "Sito," GREGORIS MARTINEZ, a/k/a "Greg," KEVIN GRULLON, a/k/a "Kev," a/k/a "JB," and JOIFFREY URENA, a/k/a "Jeff," a/k/a "Jay," the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

15.   It was a part and an object of the conspiracy that ARIEL TAVAREZ, a/k/a "A," a/k/a "Mike," CHRISTIAN BAEZ, LUIS MESON, a/k/a "Sito," GREGORIS MARTINEZ, a/k/a "Greg," KEVIN GRULLON, a/k/a "Kev," a/k/a "JB," and JOIFFREY URENA, a/k/a "Jeff," a/k/a "Jay," the defendants, and others known and unknown, would and did distribute and possess with intent to distribute controlled

7

substances, in violation of Title 21, United States Code, Section 841(a)(1).

16. The controlled substances that ARIEL TAVAREZ, a/k/a "A," a/k/a "Mike," CHRISTIAN BAEZ, LUIS MESON, a/k/a "Sito," GREGORIS MARTINEZ, a/k/a "Greg," KEVIN GRULLON, a/k/a "Kev," a/k/a "JB," and JOIFFREY URENA, a/k/a "Jeff," a/k/a "Jay," the defendants, conspired to distribute and possess with intent to distribute were (i) 1 kilogram and more of mixtures and substances containing a detectable amount of heroin and (ii) 5 kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A).

## OVERT ACTS

17. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about December 14, 2018 through December 15, 2018, ARIEL TAVAREZ, a/k/a "A," a/k/a "Mike," the defendant, operating the Candyshop Number, coordinated the sale of heroin and cocaine by CHRISTIAN BAEZ, the defendant, to Victim-1 in New York, New York.

b. On or about January 10, 2019, LUIS MESON, a/k/a "Sito," the defendant, sold heroin and cocaine to UC-1 in Manhattan, New York, in a transaction coordinated by TAVAREZ

8

through the Candyshop Number.

   c. On or about July 23, 2019, KEVIN GRULLON, a/k/a "Kev," a/k/a "JB," the defendant, sold cocaine to Customer-1 in New York, New York, in a transaction coordinated by TAVAREZ through the Candyshop Number.

   d. On or about July 24, 2019, TAVAREZ, operating the Candyshop Number, arranged for GRULLON to retrieve cocaine from GREGORIS MARTINEZ, a/k/a "Greg," the defendant.

   e. On or about July 29, 2019, TAVAREZ, operating the Candyshop Number, arranged for BAEZ to retrieve cocaine from MARTINEZ.

   f. On or about August 2, 2019, JOIFFREY URENA, a/k/a "Jeff," a/k/a "Jay," the defendant, sold cocaine to Customer-2 in Brooklyn, New York, in a transaction coordinated by TAVAREZ through the Candyshop Number.

   g. On or about August 2, 2019, MESON sold cocaine to a DTO customer in Manhattan, New York, in a transaction coordinated by TAVAREZ through the Candyshop Number.

   h. On or about August 13, 2019, URENA retrieved a quantity of heroin from a vehicle belonging to TAVAREZ in the vicinity of East Stroudsburg, Pennsylvania and transported the

heroin to Brooklyn, New York.

(Title 21, United States Code, Section 846.)

### FORFEITURE ALLEGATIONS

18.  As a result of committing the offense alleged in Count One of this Indictment, ARIEL TAVAREZ, a/k/a "A," a/k/a "Mike," the defendant, shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, any and all property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of said offense and any and all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense, including but not limited to any and all United States currency, funds or other monetary instruments credited to the following accounts:

1. Capital One Bank, Account #
2. Capital One Bank, Account #
3. Capital One Bank, Account #
4. PNC Bank, Account #
5. PNC Bank, Account #
6. PNC Bank, Account #

19.  As a result of committing the offense alleged in Count One of this Indictment, CHRISTIAN BAEZ, LUIS MESON, a/k/a "Sito," GREGORIS MARTINEZ, a/k/a "Greg," KEVIN GRULLON, a/k/a

10

"Kev," a/k/a "JB," and JOIFFREY URENA, a/k/a "Jeff," a/k/a "Jay,"
the defendants, shall forfeit to the United States, pursuant to
Title 21, United States Code, Section 853, any and all property
constituting, or derived from, any proceeds obtained, directly or
indirectly, as a result of said offense and any and all property
used, or intended to be used, in any manner or part, to commit, or
to facilitate the commission of, said offense, including but not
limited to a sum of money in United States currency representing
the amount of proceeds traceable to the commission of said offense.

### Substitute Assets Provision

20.   If any of the above-described forfeitable property,
as a result of any act or omission of the defendants:

a.    cannot be located upon the exercise of
due diligence;

b.    has been transferred or sold to, or
deposited with, a third person;

c.    has been placed beyond the jurisdiction
of the Court;

d.    has been substantially diminished in
value; or

e.    has been commingled with other property
which cannot be subdivided without difficulty;

11

it is the intent of the United States, pursuant to Title 21, United States Code, Section  853(p), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 21, United States Code, Section 853.)

FOREPERSON

GEOFFREY S. BERMAN
United States Attorney

12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

ARIEL TAVAREZ,
a/k/a "A,"
a/k/a "Mike,"
CHRISTIAN BAEZ,
LUIS MESON,
a/k/a "Sito,"
GREGORIS MARTINEZ,
a/k/a "Greg,"
KEVIN GRULLON,
a/k/a "Kev,"
a/k/a "JB," and
JOIFFREY URENA,
a/k/a "Jeff,"
a/k/a "Jay,"

Defendants.

## SEALED INDICTMENT

19 Cr.

(Title 21, United States Code, Section 846.)

GEOFFREY S. BERMAN
United States Attorney.

A TRUE BILL

Foreperson.